Happy to hear Degidio v. Crazy Horse Saloon. Mr. Holt, pleased to hear from you. May it please the court, I'm James L. Holt Jr., attorney from Memphis, Tennessee. I'm here on behalf of the defendant, appellant, Crazy Horse Saloon and Restaurant. We're here on the issue of enforcement of a arbitration agreement that the district court refused to compel arbitration upon a motion by ourselves. First, I think it's important to understand that there is but one plaintiff in this case, and that's Alexis Degidio. And she did not enter into an arbitration agreement. The plaintiff, the only plaintiff in the case, again, did not enter into an arbitration agreement. The issue before the court is whether the entertainers who did enter into arbitration agreements are bound by their arbitration agreements. There's some opt-in plaintiffs, doctor. Yes, sir. There are 15 opt-ins to this case. 15 opt-ins? I thought there were 14. Whatever. 14 or 15. Nine of those opt-ins had signed arbitration agreements with the defendant. Now, the district court. And those are the appellants? No, Crazy Horse Saloon and Restaurant is the appellant. All right. We're seeking to Yes, sir. The nine that had signed arbitration agreements are the appellees? Yes, sir. So, there are six plaintiffs who are not appellees? There are six opt-ins. There's not been a final determination on certification. There's six plaintiffs who don't have arbitration agreements. We acknowledge that. There's the one plaintiff who filed the case, Alexis Degidio, and there are six opt-ins who did not sign arbitration agreements. That case goes on. They didn't sign arbitration agreements. Right. So, there are seven plaintiffs who aren't impacted by your appeal? Nine. I believe it's nine. No, that aren't impacted. Oh, that aren't. Yes, correct. Nine that you claim. Nine that are impacted. You claim they agreed to arbitrate and you want to enforce the agreement. Yes, sir. Now, the district court and their There's an interlocutory appeal. No, sir. Well, it's not a final order. There's an interlocutory appeal. There's a right of appeal. There is a right of appeal. Oh, sure. Yes, yes. So, in that sense, it is interlocutory. Yes, sir. The district court's basis for its ruling that those agreements were not being enforced because the court determined that part of the agreement about independent contractor status was, quote, misleading, unquote. The court relied on sections of what was called a licensing, lease, and dispute resolution agreement. The court relied on parts of that agreement that were completely unrelated to the arbitration provision. The court said that the non-employee status description in the agreement was misleading because it implied that the entertainer's status as independent contractors had been decided. However, contrary to this court's finding in its order, the entertainment information package reveals that the defendant, Crazy Horse, did not say or imply anything in the agreement or in the materials that accompanied the agreement that the entertainer's status had been decided as a matter of law. The agreement merely set forth how the entertainers would be treated at what the relationship consisted of at the club. This is a They are all treated as independent contractors. They're not paid as employees. They basically keep the fees and or tips that they earn. Well, let's start from the beginning. You argued that we should review this case, de novo, but the judge reviewed it under an abuse of discretion standard. Why shouldn't we do that in light of the Billingsley case out of the Fifth Circuit, 11th Circuit? Well, because of the principle that arbitration agreements are to be enforced. In fair labor standards, though, collective actions are favored. Well, no. Actually, the Fourth Circuit has ruled in the Atkins case that collective actions can be waived in an arbitration agreement. I'm not talking about being waived. I'm talking about being favored under the FLSA. Well, in Atkins, it was an FLSA lawsuit and there was an arbitration agreement, and the issue was whether the arbitration agreement would be enforced, even though it was an FLSA action. The Fourth Circuit ruled in Atkins that, yes, that is enforceable, that there's nothing in the FLSA or in the FAA that would make collective actions trump the mandatory provisions of the FAA. Well, the district judge got to the point he did by finding that the arbitration agreements were misleading, and so the question is, under what standard do we review that? De novo or use of discretion? De novo. We've cited, I think, three cases in our brief. How about the clear error? It sounds like she found it misleading. That's kind of like a finding of fact or something. Well, my understanding of the FAA and the right of appeal under the FAA, if an arbitration agreement is not enforced, that there is an arbitration agreement. I don't think that's going to alter the FAA statute that allows for someone who seeks to enforce an arbitration agreement to have that heard by the Court of Appeals and have that heard de novo. You're saying she said it was misleading, the arbitration agreements were misleading, the judge did. You say they're not, right? Yes, Your Honor. A review of the record will show that what the court indicated was misleading was not misleading at all. What the court got sidetracked... She erred in saying it's misleading. That's an error. You think it's an error? Yes, sir. Yes, I think that finding of it being misleading is an error. First, she didn't even look at the arbitration provision. There's nothing she raised in the arbitration provision that says there's anything misleading in the arbitration agreement. What the judge found misleading was that we were, I don't know, extolling the virtues of an independent contractor relationship. She seemed not to like the fact that we were entering into independent contract relationships. You were interviewing punitive plaintiffs, members of the class, after the lawsuit had been initiated. These arbitration agreements were garnered from these nine people after the lawsuit was started. Yes, sir. The claim was originally filed in August of 2013, and the plaintiff did not file a motion for conditional certification of the case until December 2014, the month before. But you got the arbitration agreement in 2014? That's when we started entering into with arbitration provisions in mid-November of 2014. And you asserted the arbitration agreements in this case in 2015? Yes, we made the court aware. When did you assert that they wanted the court to compel arbitration? We filed our motion to compel arbitration in October of 2016. 2016? Yes, sir. Three years after the suit had been started? Yes, yes. But here's the point. The plaintiff didn't have an arbitration agreement. There was no reason to file any motion to compel arbitration until there was an opt-in who had an arbitration agreement. But you have a business relationship with these folks. You're their employer. You have a lot of leverage over them. And you're trying to, after a class action suit has been filed, you're trying to strong-arm them into signing arbitration agreements in order to whittle down the size of the class. And you're taking advantage of your business relationship to do that while there's pending litigation. And you're not informing the court about any of it. You know, that strikes me as very marginal behavior. No, sir. Respectfully, Your Honor. The club, as a defendant, as a business, has the absolute right to enter into any kind of entertainers who, again, are not employees. They're considered independent contractors. So that's the whole question. That is a question. And now we would submit. That's a legal question. That's a submit. We would submit that's a question for the arbitrator. Well, and you also had here lawyers contacting these people in possible contravention of the rules of professional responsibility about lawyers contacting other parties. You will not find that in the record. There may have been allegations of that made. I'm bringing it up myself. But no, it did not happen. I used to be a lawyer. But you went behind their lawyers, didn't you? You went. No. You didn't inform the court. And you went behind their lawyers. And you went, the employer went to the individual class members and employees. Or as you put it, independent contractors. But there was a business relationship in which you exercise the control and you never informed the court of this. And as far as I can see, you didn't inform the attorneys of this. You went behind everybody's back during pending litigation to get people to sign these agreements. It's just, I mean, my colleague Judge King says that rules of professional responsibility are implicated here. Why aren't they? Because that didn't happen at, the record does not show that that happened. Again, this case was just sitting without any motion. The lawsuit was filed in 2013. And after that, you went and got these arbitration agreements from people who were parties against you. I mean, with lawyers dead. No, none of those people that signed arbitration agreements were plaintiffs in the case. Did you consult the lawyers before talking to these people? No, sir. But I didn't talk to those people. The lawyers did not talk to those people about the arbitration agreements. Those were presented to them in November of 2014. Many of whom were there for the first time and had never entertained them. The members of the court asked a question. Yes, sir. Sorry. You go ahead. That's fine. I'm sorry. No, you go ahead. Make your argument. Okay. At the time these arbitration agreements and agreements were rolled out, none of these entertainers were plaintiffs in the case. There was no relationship between them. They were part of the class, weren't they? And there was an opt-in claim and an opt-out claim. They were part of a class that plaintiffs sought to be a class, but was yet to be determined, and yet to have any motion filed for a class. There was a state claim and a federal claim. Yes, sir. One was an opt-out claim and one was an opt-in claim. Correct? Well, yes. There's a Rule 23. And the opt-out claim, they were members of the... And they had to opt out to get out of that one. And the other one, they had to opt in. And you all talked to them and got these arbitration agreements from them after that suit was started, when they were part of the class. After the suit was started, yes, but no motion for either Rule 23 certification or Fair Labor Standards Act certification had been filed to a year and a half later. Excuse me. How were the arbitration agreements presented to the class members? Well, that's in the record and that's... Thank you for the opportunity to answer that. There was an arbitration agreement that was presented to them to sign and some acknowledgement forms and an explanation of what arbitrate... It didn't just walk on its own. Somebody had to carry it over there. Yes, someone at the club gave the arbitration agreement to each entertainer. And that someone included a lawyer? No, sir. Well, there was talks about... There's discussion in here about lawyers being present with the boss. There's an allegation made of that, but that is not true. Well, we'll ask the other side. Then the district court did not find that. I know there's a lot of information here, but let me talk about what was presented to each entertainer. Your red light is on. All right, may I have a few minutes to... No, you may not. You may have that in rebuttal. Thank you. Mr. Edsel. May it please the court. I'd like to start by addressing Judge Floyd's question as to the standard of review. The standard of review, with respect to the grounds on which the district court ruled, is abuse of discretion. The authority for that is the Gulf Oil Supreme Court case. It's also referenced in Hoffman-LaRoche, which is a 1989 Supreme Court case. And then it's also the standard that the Billingsley Court used in the 11th Circuit. A few things I'd like to correct. This defendant submitted declarations in support of a summary judgment motion and in opposition to our class certification brief. And two of the declarations did indicate that the declarants had met with legal counsel for Crazy Horse. The first one's at JA85, paragraph 3. By legal counsel for Crazy Horse, you mean the lawyer for the other side? Well, I don't know if it was the exact same lawyer that is defending... But they're counsel for the party. Yes, for the party. That you were suing. Yes. JA85, paragraph 3. And then the Poisson Declaration, which is a few pages later. Were they meeting with the individual employees or contractors without any notification to the court and without any notification to counsel to get them to sign arbitration agreements at the time when the litigation was ongoing? That's totally correct, Your Honor. So according to their CFO's declaration or affidavit, they first began getting the arbitration agreements in mid-November 2014. I want to point out the discovery period closed on November 17, 2014. So they began this immediately at the end of the discovery period and also about four weeks before our class certification brief was filed. But it can't be the case that attorneys for a defendant can talk, can go around behind the lawyers for the plaintiffs and can go around the court and during pending litigation, try to get arbitration agreements signed in order to affect the, in order to diminish the class size. I mean, that just can't be right. I fully agree, Your Honor. I think district courts need to be empowered to monitor this class and collective action process and especially the communications that are made to the punitive class. Normally, arbitration agreements are signed well before any litigation. I mean, they're signed at the onset of employment. They're not used as, they're not wielded as tools whereby an employer can exercise undue influence over an employee while litigation is going on. Once again, we agree. We think it creates an imbalance here. Meanwhile, the plaintiff's counsel, if we were to start communicating with these people without telling anybody, we'd be accused of improper solicitation. So I submit that if plaintiffs are not able to contact the punitive class members without court permission to solicit opt-ins, defendants shouldn't be allowed to communicate with them to solicit opt-outs. And that's exactly what they did here. The arbitration agreements are the exact legal equivalent of an opt-out agreement or an opt-out form that a plaintiff might submit in a Rule 23 action. You're saying the opt-ins have to contact the court. Well, so in an FLSA collective action, there's an affirmative obligation for each plaintiff to opt-in in writing. That's an important point because... Is that unique to the South Carolina law? It is not. That is the Federal Fair Labor Standards Act law. The federal law. What's the South Carolina law, Brad? So the South Carolina Payment of Wages Act does not have an opt-in procedure, which is why we litigated it as a parallel Rule 23 opt-out class action. It's the opt-out provision. It's a claim. Yes. There's an opt-out claim and an opt-in claim. Yes. The opt-in is the federal claim. The opt-out is the state claim. So the reason that that is particularly significant in this case is... So at the time the lawyer for Crazy Horse was talking to these, you say there are at least two, they were part of the opt-in claim for sure. Opt-out claim for sure. The South Carolina claim. Yes. So we had... They can't even argue at that point. Right. This was not a one plaintiff lawsuit from three months after the case was filed was when we began to get opt-ins. We had multiple opt-ins. And I just want to point out the nine opt-ins who signed the arbitration agreements, the last one of them to submit their opt-in form to the court was January 14, 2016. We didn't get the motion to compel arbitration for another nine months. And at that point, there can be no argument that they were not there or that the defendant wasn't aware of them or they weren't parties of the case. They were in the case. They opted in. That's your waiver argument. Yes. It wasn't addressed by the district court. That's correct. But you addressed it first. Do you think that's your better argument? Well, I think it's extremely compelling in this case. We had five motions that could have been dispositive motions filed by the defendant. Dispositive motions. So that's engaging the litigation machinery. That is trying to win the case in court. That's not consistent with... The strategy there to have two bites at the apple. Exactly. They also asked the court to certify a couple of questions to the South Carolina Supreme Court. Correct. And those motions both were filed when all the opt-ins were here. They were all in the case already. So that relates specifically to the plaintiffs who signed the arbitration agreement. And the district court denied that. They asked to certify them again. Exactly. They were relentless. They're still arguing that issue. That issue was about an interpretation of the South Carolina Payment of Wages Act. They're still arguing it. Tips or wages. Right. The issue of whether tips or wages. As a matter of fact, and there was one of the things that the judge talked about in her discussion of whether to recognize these things, is that they told them that if they became employees, they'd have to turn over all their tips to the boss man. Yeah, that's right in the record. To me, that's coercive. They essentially say... That's what comes off the page to me. Yeah, if this lawsuit succeeds or if you're deemed an employee, we're going to change your compensation structure and take away your largest source of income. And there's no law that says they have to do that. Opposing counsel said that Adkins v. Labor Ready controls here. What do you say as to that? No, it doesn't. Just tell me why not. I'm not precisely familiar with that case right now. I apologize for that. If it relates to the... We don't know whether it controls or not, then. You can't answer, Judge Wilkinson. I don't... Honestly, I don't even remember seeing it in their brief. There's no way he's talking about it. Yeah. I have a better way to answer it. If you don't know, say you don't know. I don't know. So, excuse me. There was... Oh, yes. The other point I wanted to make is they're still trying to litigate this tips and wages issue before this very court. They filed a Rule 23-F petition. And one of the primary grounds of error that they're arguing the district court made was ruling on that legal issue that governs a substantial part of the case. So, it's very difficult for us to... You know, we're responding to both issues here. Do they want to arbitrate? Do they want to litigate? We've been responding to all of their dispositive motions. We've responded to their Rule 23-F petition. This is all in court. And these are legal issues that govern the whole case with respect to these plaintiffs. It's not just plaintiff de judeo. It's all... It's a legal issue. And however the court decides it, it's going to govern the entire case. And that goes back to the motion for summary judgment that they filed right around the time that they were soliciting the arbitration agreements. They moved for summary... Rule 23-F petition to appeal was filed like a week after the notice of appeal? Yes, very close in time. And that would have the effect of getting relief up here if we granted it. It would have the effect of getting relief against the other five or other six plaintiffs who are not appellees here? No, I don't think the Rule 23-F opinion... Well, I guess it would. It would affect the class certification issue. Arbitration agreements don't apply to everybody. That's correct. But again, this Rule 23-F petition would get relief for Crazy Horse against them as well. Well, if the class were decertified, then yes. Well, that's right. Yes. But I want to highlight also, as I was mentioning, they filed a motion for summary judgment on all claims. And while at that time there were only plaintiff de judeo and a couple other opt-ins, it was on legal issues as well as factual issues. And it was not targeted directly to plaintiff de judeo. And the issue they won... So what you're saying is there should have been a motion to compel arbitration at a timely point and at the earlier point in the litigation. And when the motion to compel is not filed in a timely fashion, and you go, as Judge King points out, making motions to certify and motions for summary judgment and serving discovery requests and everything, that's about as far away from making a motion to compel. Because the whole idea of arbitration is that it's an alternative dispute mechanism that saves the party's time and resources. And you don't save the party's time and resources when you delay indefinitely in filing a motion to compel and in the meantime, go through the full regalia of litigation. That undercuts everything arbitration is about. Exactly. I don't disagree with anything there. Let me compound it here because if we agreed with them that they had to arbitrate, the nine had to arbitrate, you'd still have the lawsuit. Right. Because there are people in it that don't have arbitration agreements. Yes, we'd still have the lawsuit. Two different forums, so you'd still have more resources. That's correct. And I think there's some of the people subject to arbitration agreements, there are questions about if they're compelled to arbitration and then they file an arbitration, is their claim timely now? Because a lot of these claims date back several years because the case is several years old and the defendant waited a long time before it moved to enforce the arbitration agreements. And I just wanted to, again, get back to the summary judgment. They won summary judgment on an issue of the South Carolina Payment of Wages Act. The district court ruled that it was preempted by the Fair Labor Standards Act. So what that did was it prevented us from maintaining a claim for minimum wages and overtime under the state law. It would have been parallel, but that would have given us the ability to have an opt-out. You'd have to cross the field on that. Well, we haven't had the occasion to yet because there's no final order. It's not up here. That's what I'm... It's not up here. I'm just... I'm pointing this... That issue's not here. That issue's not before the court. I'm pointing it out because it's prejudiced us. It's taken a claim away from us in the court. They invoke the courts to destroy a claim. Now, we're going to try to revive it at the end of the case after trial. We'll probably appeal that decision if we deem it necessary. But in the meantime, we've had to litigate without that claim. What is it that you found most objectionable about the presentation of the arbitration agreements to the individual employees or contractors in this case, just in a nutshell? In a nutshell, no notice to the court or to us that these communications were happening, even though they directly concern the litigation and resulted in opt-outs. That's number one. In terms of the substance of the communications themselves, for one, they directly say, if you're deemed to be an employee, you're going to lose your performance fees. You won't get to keep them anymore. We're going to confiscate them. That's an economic threat that accompanies... Performance fees, you call them. Is that same as tips? So, well, that's basically a legal question. Our position... Is that what you all were talking about there? The judge was talking about tips. Yeah, yeah. Those are what you call performance fees? Yes. They come through different methods in the club itself. Customers give money to the entertainers in various ways. One of them might be to buy a private dance. So those are typically called performance fees or service fees. Our argument is they're all tips. It's all money coming from customers. None of it is something a customer has to do to get in the door. It's all tips. It's all the property entertainers. So when the club is saying, we're going to take performance fees away from you if you're an employee, in the context of giving them an agreement they need to sign that says, and if you sign the agreement, you can keep all those fees. That's a pretty coercive environment. It's not a neutral and balanced presentation of the relationship between the parties. But the point is things were happening in the case that you were unaware of. Exactly. We had no awareness of this at all until they responded to our motion for class certification. The whole legal system works on a certificate of service. And that is when lawyers file a document in court or when they do something, you're supposed to let the other side know and not work behind the other side's back. Every document that's filed with the court is served on the other party. That's just basic professional courtesy and ethics. And so what you're saying is that this was just blindsiding you. Yeah, we did not know about this until they responded to one of our motions. It was several months after they'd started it. And by the time they told us they did it, they'd already signed up everyone that was currently working in the club. I think it was about 114 entertainers or something like that. So just to conclude, on the grounds the district court used in ruling, the district court had discretion to monitor the conduct of the parties and the communications made to class members. The arbitration agreement, the fact that it is an arbitration agreement itself doesn't put it in this untouchable box where the district court cannot say, look, you did this in a totally improper manner and I'm not going to recognize those agreements for the purpose of this case. Keep in mind that the district court's order was limited. The only effect is that she's not going to compel arbitration under those agreements in this case. In a future case, that agreement might be effective. So it's not an interference with the defendant's business relationship with its entertainers, except in this case, because it obtained them in an improper way. The street order that we're reviewing here is the motion to, is simply the denial of the motion to compel. That's correct. The court carried the Rule 23-F petition with the arbitration appeal. It remains pending. Right. But that's a separate, has a separate appeal number on it. Yes. And it remains pending. And then what you're arguing today is the arbitration appeal. That's correct. You say remains pending. I'm interested in that. What is it you say remains pending? The 23-F petition. The petition for permission to appeal, we haven't ruled upon. Right. We have held it in abeyance, unofficially, pending this oral argument. Right. How does this appeal affect the 23-F? Well, one of the grounds that the Dull House used in its 23-F petition is that there should be no numerosity for the Rule 23 class because everybody signed an arbitration agreement. Everybody except a small handful. In our answer, we point out there's still at least, I think, 36 that didn't. Plus, there's been no discovery on that particular issue. So we don't really know for sure. It's just Dull House's representation. What are you urging us to do with the 23-F? Deny it. And you filed a response asking us tonight. Yes. Yes, we answered. Yes. Asking that we deny the petition for appeal. Yes, we did. Yes. So if... All right. Thank you, sir. All right, Mr. Holt. We'd be pleased to hear from you, sir. All right. Thank you, Your Honor. Let me first address this idea that the court seems to be under a presumption that communications between the defendant or even its attorneys to people who are in what's putative being the term used for members who plaintiff seeks to be in the class, that somehow that's forbidden. That is not, Your Honor, the law. What about the ones that are in the opt-out class? They're in the case. The opt-out class, the state claim is an opt-out class, and those plaintiffs are in the case. That motion had not even been filed yet. What I'm talking about is the pre-certification stage. Discovery rules, if you want to talk to or want to get a discovery or interview a member of the plaintiff, adverse party, you file interrogatories or you take deposition. Lawyers can't go talk to represented parties on the other side and get arbitration agreements from them after the suit's filed. What? And expect to be successful with it. I mean, you've got rules that govern this stuff. That's what I want to talk about is what are the rules regarding pre-certification communications? There are cases on this, and they are not limited. Pre-certification is federal. They've got another kind of claim there that's an opt-out claim. They're in it unless they jump out. But there is no class yet. That they're not in unless they come in. At the time the arbitration agreements were entered into, there was no class yet. It was just a lawsuit filed seeking a class. Now there is, I submit your honors, will not find a case that there is some uniform ban on arbitration agreements or communications, but the court seems to be under the impression that there is. I'm telling you, your honors, respectfully, there is no such limitation on pre-certification communications. This was a case that was filed in one year. A year and a half later, we enter arbitration agreements. We filed the motion for summary judgment on plaintiff's claim before... Excuse me. The district court certainly thought that there was something wrong with it. Yes, your honor. And the courts have said, if you're going to find something wrong with it, you need a specific incidence of coercive or misleading conduct. And that was the importance of the court's finding on misleading. She identified some cases from other jurisdictions where it was misleading. Our point is articulated in the brief. I don't know if I have time to articulate it as much as I should today, but the communication that we made on the arbitration agreements was completely distinguishable from the findings of misleading. In our arbitration agreement, we told each individual one, there is a lawsuit and it's pending. We gave them the name of the lawsuit. The district court was saying, well, the arbitration agreements here were themselves misleading because it simply states in the arbitration agreement that you are not an employee. And that's what a great deal of the case was about. Your honor, every independent contractor agreement throughout the country says you are not an employee. You are an independent contractor. That was the nature of the agreement. It was an independent contractor agreement. But maybe they are and maybe they aren't. I mean, yes. But the point is when you submit an arbitration agreement to someone and you're essentially asking them to stipulate away their case. No, sir. That's exactly the point I've been trying to get to. We told each one in writing that there is a case pending and they are challenging the independent contractor agreement. You have the ability to join that case. All you have to do is opt out of the arbitration provision. We gave them 21 days to opt out of the arbitration agreement. That is the most important point in the case. And that's what distinguishes it from other cases that have found pre-certification communications misleading. We gave them the opportunity. Each one of them, each of these nine people signed something saying they understand they have 21 days to opt out of the agreement. They have time to consult an attorney. There was no pressure to sign the agreement. In these other cases where it was misleading, they're telling me if you don't sign this, you're fired. We didn't say that. We said you sign this agreement and if you want to opt out of the arbitration part of it, you can. And we even went further that if you opt out of the arbitration provision, you will be able to participate in the lawsuit. But if you don't opt out, then you will not be able to participate in the lawsuit. That's what an opt-in agreement does. If this court finds that what happened here, what the record shows happened here, it will be an outlier from other circuits and other decisions. Those decisions are cited in there. There's an 11th Circuit decision, what's that called, McGinnis or something, that's almost right on point with what you're talking about, that goes against you. The judge... I'm not... Well, Judge Hendricks... Oh, yes, Billingsley case. She cited it. Yes, sir. She relied on it. Yes, sir. 11th Circuit decision and it's right on the money. Yes, sir. And they talked about the coercive way. There was no opt-out provision in that agreement. Your Honor, it's completely distinguishable from our case. They were told in that agreement, they weren't told of the lawsuit. Here, we're telling them of the lawsuit. We're telling them you can opt out of the arbitration and participate in the collective action if you want to. There is no law, Your Honors will find, that says an employer or a business, I mean, we employ waitresses and bartenders. These people are independent contractors. There's no law that says once a collective action is filed against you, you cannot enter into any future contracts with anyone. That's the effect of the district court's decision. If it's affirmed, that's the decision of the Fourth Circuit Court of Appeals. And I would submit that is a radical departure from other cases where the pre-certification conduct is not so restricted. There are free speech rights and you'll see those cited in those opinions. Those are cited in our opinion, the Eastwood case, the Bobrick case. They are there. And so, what I ask the court to look at is what is it that the court found was misleading? And because it is not misleading, simply to say here's what our relationship is. Or coercive. Or coercive. In any way. That is correct. There was no timetable. You don't have to sign this right now. You can talk to an attorney. All that is in the materials that each of the opt-ins signed. Well, that's true. But on the other hand, the relationship, there's a bit of coercion in the relationship. Because you're the employer. They're the employee. And normally, these sorts of arbitration agreements are signed at the outset of an employment relationship. They're signed, you know, at the time you come on board. They're not signed during the pendency of litigation. As a general matter, they're signed a priori. Your Honor, first, let me give you the context. I want you to respond to my question. Yes. Yes. I want to. Because your question presumes that it's a typical situation and these are typical employer-employee relationship. It is not. These entertainers, the business in Myrtle Beach, South Carolina is very seasonal. Some entertainers come in for a day. Some come in for a week. Some come for two weeks. Some come intermittently over a period of a year. It is not the same as someone showing up for work every day. There is no schedule. But you've still got a lot of leverage over these folks. In other words, if they don't sign, they could be out of a job. If they don't sign, then we say yes. This is the relationship. You either accept it or you don't accept it. But you lose your work. Well, you don't entertain. You don't entertain there. But you can entertain here and opt out of the arbitration provision if you want to. All right. I think we've been around and around on this. May I address the waiver argument since your Honors did? No, I think we understand those. We appreciate it. All right. Thank you, Your Honor. All right.
judges: J. Harvie Wilkinson III, Robert B. King, Henry F. Floyd